UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| In re ) | |
| ) | |
| NEWGENT GOLF, INC., ) | Case No. 6:04-bk-13479-KSJ |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| MARIE E. HENKEL, ) | |
| ) | |
| Plaintiff, ) | Adversary No. 6:06-ap-155 |
| vs. ) | |
| ) | |
| FRESE, HANSEN, ANDERSON, ) | |
| HUESTON, & WHITEHEAD, P.A., ) | |
| MSM GOLF, LLC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

MEMORANDUM OPINION

The Chapter 7 Trustee, Marie Henkel, seeks an order directing the defendant law firm, Frese, Hansen, Anderson, Hueston & Whitehead, P.A. (the "Firm"), and its client, MSM Golf, LLC. ("MSM"), to return $58,846.60 that the Firm transferred post-petition to MSM, allegedly in violation of the automatic stay. The Firm contends that they have no obligation to return the monies to the trustee because the debtor, Newgent Golf, Inc., had assigned its interest in these funds to another entity over five years before it filed this Chapter 7 case, and, therefore, the monies are not property of the debtor's bankruptcy estate. As discussed below, the Court jointly and severally directs MSM and the Firm to pay the monies to the trustee and to reimburse the trustee for all costs she incurred in bringing this adversary proceeding.

The debtor formerly was in the business of building golf courses but lacked capital to buy necessary construction equipment. The Firm's client, MSM, managed golf courses, and, at some point many years ago, entered into two contracts with the debtor. In one of these contracts, MSM

and the debtor agreed that MSM would purchase the needed construction equipment and then lease the equipment to the debtor. A breach of contract dispute arose between MSM and the debtor; MSM filed suit against the debtor and, on July 6, 1999, with the Firm's representation, obtained a Writ of Garnishment on one of the debtor's accounts receivable owing from an entity called Palm Bay Golf Club, Inc. ("Palm Bay") (Plaintiff's Ex. No. 2).

Approximately one week before MSM obtained its Writ of Garnishment, the debtor entered into a series of factoring agreements with an entity known alternatively as Classical Financial Services, LLC, and Cash Flow Management, L.P. ("Cash Flow"[1]) (Defendant's Ex. Nos. 1, 2, 6, 7, and 8). Cash Flow agreed to advance funds to the debtor in exchange for a security interest in and an assignment of the debtor's accounts receivable, including any monies due or to become due from Palm Bay (Defendant's Ex. No. 4). Cash Flow later filed a UCC-1 Financing Statement with the Secretary of State in Tallahassee, Florida, perfecting its security interest on July 28, 1999 (Defendant's Ex. No. 6).

MSM and its attorneys were unaware that the debtor had pledged its accounts receivable to Cash Flow just before they obtained the Writ of Garnishment. According to the trial testimony of Allan P. Whitehead, the attorney from the Firm, he and MSM were suspicious of the relationship between Cash Flow and the debtor. MSM believed the factoring agreements were sham transactions conducted at less than an arm's length and with the collusive intent of frustrating any interest MSM had in the Palm Bay receivable. MSM filed a third party complaint in the pending state court breach of contract litigation bringing Cash Flow into the fray and seeking to avoid the debtor's assignment of its accounts receivable to Cash Flow. At some point,

---

[1] Because the distinction between Classical Financial Services, LLC and Cash Flow Management, L.P. is irrelevant for the issues raised in this dispute, the Court will refer to the two entities jointly as "Cash Flow," even though the underlying agreements may reference one or the other entity.

Palm Bay also was joined in the litigation to determine the amount of the receivable they owed to the debtor.

From 1999 through 2004, the litigation between MSM, the debtor, Cash Flow, and Palm Bay continued through various trial and appellate courts. For example, on May 4, 2001, the Fifth District Court of Appeals held that the factoring agreements between the debtor and Cash Flow were valid and enforceable (Defendant's Ex. No. 9). After that decision, the litigation between the parties morphed into a priority dispute between MSM and Cash Flow over who had the superior claim to the Palm Bay receivable, which remained unliquidated. (By this point, the debtor had stopped operations and its principal, Steven Newgent, had filed a personal bankruptcy.) The parties agreed that the Palm Bay receivable constituted the only funds available for distribution.

On November 5, 2004, the debtor, Cash Flow, MSM, Palm Bay, Steven Newgent, and Raymond Watson (principals of the debtor who had also personally guaranteed the debtor's obligations under its contracts with MSM) agreed to liquidate the amount of Palm Bay's receivable, to deposit the agreed amount into the Firm's trust account, and to give Palm Bay a general release (Plaintiff's Ex. No. 3). Upon payment of the agreed $190,765.85 (the "Palm Bay Receivable"), Palm Bay was dismissed as a party.

The release also specifically provided that MSM, the debtor, and Cash Flow were the "sole entities entitled to receive" the Palm Bay Receivable. At all times, the parties agreed that the funds comprising the Palm Bay Receivable were attributable to work performed by the debtor for Palm Bay in connection with the construction of a golf course. The only remaining issue was whether MSM, based on its Writ of Garnishment, or Cash Flow, based upon its security interest, had the superior right to the monies. (Defendant's Ex. No. 14, ¶ 3). While the parties resolved this remaining priority issue, the state court directed the Firm to hold the monies

in its client trust account until further order of the court (Defendant's Ex. No. 14, ¶ 4). The Firm actually received the monies from another law firm on December 21, 2005.

At the trial held in this adversary proceeding, Mr. Whitehead, relying on the release given to Palm Bay, testified that he believed the debtor had lost any interest in the Palm Bay Receivable. Nothing in the release, however, operated to divest the debtor of its interest in the Palm Bay Receivable. Rather, the release specifically stated that the only parties with any possible continuing interest in the receivable were MSM, Cash Flow, and, most notably, the debtor. As such, even though the debtor did little to protect its position, the release certainly did not relinquish any remaining interest the debtor had in the Palm Bay Receivable.

A few weeks after executing the release, the debtor filed this Chapter 7 bankruptcy case on December 16, 2004. Marie Henkel was appointed as the Chapter 7 trustee charged with administering the debtor's estate. The debtor did not disclose the existence of the Palm Bay Receivable in its bankruptcy schedules, stating that its only asset was $150 in office furniture (Defendant's Ex. No. 15, Schedule B, Items 15 and 26). Further, although the debtor did list many other pending lawsuits filed against it, the debtor did not disclose the pending litigation over the Palm Bay Receivable in its Statement of Financial Affairs (Defendant's Ex. No. 15, Statement of Financial Affairs, Question 4(a)). Interestingly, MSM but not Cash Flow was listed as a creditor in the debtor's schedules (Defendant's Ex. No. 15, Schedule F, Doc. No. 1).

The Chapter 7 trustee conducted a meeting of creditors on January 25, 2005. Mr. Whitehead and the Firm received notice of the bankruptcy filing as MSM's representative. The Firm sent a lawyer, Erika McBryde, to attend the meeting of creditors. Neither the debtor's representative, Raymond Watson, nor Ms. McBryde disclosed the existence of the outstanding Palm Bay Receivable at the meeting of creditors.[2] The trustee, thus, had <u>no</u> credible knowledge

---

[2] Ms. McBride's memorandum reflects that she did tell Ms. Henkel about the MSM lawsuit (Defendant's Ex. No. 21).

that the Chapter 7 estate may have a claim to monies of almost $200,000, because it simply was not disclosed by the debtor, the debtor's principal, MSM, or the Firm.

During the year following the bankruptcy filing, the debtor, Cash Flow, and MSM, with the Firm's representation, continued the state court litigation over who had the superior claim to the Palm Bay Receivable. No suggestion of bankruptcy was filed with the state court informing it of the debtor's bankruptcy filing. No party sought relief from the automatic stay seeking this Court's permission to proceed with the state court litigation, even though both MSM and the Firm had notice and actual knowledge of the debtor's pending bankruptcy case.

Approximately one year after the debtor filed this bankruptcy case, on December 21, 2005, the state court judge, unaware of the debtor's bankruptcy filing, issued an order determining the priorities of the competing claims between MSM and Cash Flow and apportioning the Palm Bay Receivable between the two creditors (Plaintiff's Ex. No. 4). No portion of the Palm Bay Receivable was allocated to the debtor. Rather, Judge Moxley held that Cash Flow, as a secured creditor, was entitled to receive $131,839.25. MSM was entitled to receive $58,846.60, based on the amounts Palm Bay stated it owed the debtor when it filed its Answer to the Writ of Garnishment. Judge Moxley found that Cash Flow had a perfected security interest in the debtor's account receivables as of the date it filed its UCC-1 Financing Statement with the Florida Secretary of State, July 28, 1999, but that prior to that date MSM had priority to the Palm Bay Receivable as a result of service of its Writ of Garnishment on Palm Bay on July 6, 1999. Judge Moxley made no finding that MSM held a secured claim to the $58,846.60.

Judge Moxley's order, however, only directed payment of the $131,839.25 to Cash Flow. The Firm specifically was directed to hold the monies allocated to MSM pending further order of the state court (Plaintiff's Ex. No. 4, ¶ 5). Therefore, a second order was needed before the Firm could transfer the monies to its client, MSM.

On February 3, 2006, long after this bankruptcy case was filed, the debtor's two principals, Steven Newgent and Raymond Watson, through a lawyer signing on behalf of all defendants in the state court cases, signed a Stipulation Regarding Disbursement in which the defendants agreed that the Firm could disburse $58,846.60 to MSM (Plaintiff's Ex. No. 5). The Stipulation also was signed by Mr. Whitehead.  The Stipulation stated, "The parties have now agreed that…the remaining balance of $58,646.60 is to be disbursed to MSM." Based on the parties' stipulation and still unaware of the debtor's bankruptcy filing, on March 6, 2006, Judge Moxley entered an order approving this distribution to MSM (Plaintiff's Ex. No. 6).  The Firm disbursed the monies to MSM on March 19, 2006 (Defendant's Ex. No. 19).  Neither MSM nor the Firm requested relief from the automatic stay prior to disbursing these funds to MSM despite having actual knowledge of this pending bankruptcy case and the debtor's continuing interest in these funds.

The Chapter 7 trustee first learned of the Palm Bay Receivable on April 6, 2006, when Cash Flow appropriately sought to modify the automatic stay to obtain its portion of the Palm Bay Receivable pursuant to its perfected security interest and the state court order (Doc. No. 9 in the Main Case).  The trustee, after evaluating Cash Flow's request and concluding that Cash Flow did indeed hold a valid pre-petition security interest, did not oppose the distribution. On May 18, 2006, this Court entered an order granting Cash Flow's Motion for Relief from Stay, explicitly stating that the relief applied to Cash Flow only and to no other party (Doc. No. 18 in the Main Case).

The trustee then started to investigate whether the estate had any rights to the $58,846.60 amount remaining from the Palm Bay Receivable that the state court had ordered to be paid to MSM.  Ms. Henkel withdrew her report of no distribution and started efforts to collect the remaining monies from MSM and the Firm.

On November 18, 2006, the trustee filed a three-count complaint initiating this adversary proceeding seeking turnover of the $58,846.60. In Count 1 of the Complaint, the Chapter 7 trustee seeks a declaratory judgment that MSM and the Firm willfully violated the automatic stay, are jointly and severally liable for the turnover of $58,846.60, and that sanctions pursuant to Bankruptcy Code[3] Section 105 are appropriate. The trustee also argues that the state court order directing the disbursement to MSM is void *ab initio* as it was improperly entered post-petition in violation of the automatic stay.  The trustee seeks turnover of the funds in Count 2, pursuant to Section 542(a) of the Bankruptcy Code.[4]  The trustee further argues that MSM had no priority rights to the Palm Bay Receivable arising from its Writ of Garnishment and that MSM is no different than any other unsecured creditor in this case entitled to receive a pro-rata share of the debtor's assets available for distribution.

In response, the Firm first argues that the Palm Bay Receivable was not property of the debtor's estate subject to administration by the trustee.  Although it was originally the debtor's account receivable, the Firm argues that it had lost that characterization many years before the debtor filed this bankruptcy case due to MSM's Writ of Garnishment and the debtor's assignment and security agreement with Cash Flow.

 Second, the Firm argues that the debtor, and by extension, the trustee, is estopped from asserting any interest in the receivable because the debtor's principals, Messrs. Newgent and Watson, signed both the release given to Palm Bay and the Stipulation Regarding Disbursement given to MSM.  As to the release, the Firm argues the debtor affirmatively waived any interest it

---

[3] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

[4] In Court 3, the trustee also sought the avoidance of the transfer pursuant to Sections 549(a) and 550 of the Bankruptcy Code.  Because the Court directs the defendants to repay the funds as a consequence of their intentional and willful violation of the automatic stay, the Court need not address this alternative basis for relief raised in Count 3.

had in the Palm Bay Receivable by agreeing to have the funds deposited in the Firm's trust account prior to filing this Chapter 7 case. As to the Stipulation Regarding Disbursements, notably signed post-petition on February 3, 2006, the debtor explicitly agreed that the Firm could disburse $58,846.60 to MSM.   Third, the Firm argues that the stay relief obtained by Cash Flow somehow sanctioned the Firm's disbursement to MSM.

<u>The Palm Bay Receivable was Property of the Debtor's Bankruptcy Estate</u>

Two significant events occur when a business, like the debtor here, files a Chapter 7 petition initiating a liquidation case.  First, a new estate is created.  Second, the automatic stay arises.

Pursuant to Bankruptcy Code Section 541 and upon the filing of a bankruptcy petition, an estate instantaneously is created consisting of all legal and equitable interests of the debtor, regardless of where such property is located or who holds the property. 11 U.S.C. § 541(a); <u>In re Matthews</u>, 380 B.R. 602 (Bankr. M.D. Fla. 2007); <u>In re American Way Service Corp.</u>, 229 B.R. 496 (Bankr. S.D. Fla. 1999).  Congress intended courts to broadly construe Section 541 to include anything and everything of value a debtor had or could claim.  <u>In re Holywell Corp.</u>, 913 F.2d 873, 881 (11th Cir. 1990); <u>In re Forbes</u>, 372 B.R. 321 (B.A.P. 6th Cir. 2007). Ownership interests encompassed within the magical term "property of the estate" include tangible, intangible, conditional, future, non-possessory, speculative, and derivative interests. <u>In re Bracewell</u>, 322 B.R. 698, 703 (M.D. Ga. 2005) (citing <u>Meehan v. Wallace</u> (<u>In re Meehan</u>), 102 F.3d 1209, 1210 (11th Cir. 1997) (quoting <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 205 n. 9 (1983))); <u>In re Carlton</u>, 309 B.R. 67, 52 (Bankr. S.D. Fla. 2004).

The trustee's right to administer estate assets is limited to the rights held by the debtor just before the commencement of the bankruptcy case. <u>Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards</u>, 437 F.3d 1145, 1149 (11th Cir. 2006) (citing <u>O'Halloran v. First Union Nat. Bank of Florida</u>, 350 F.3d 1197 (11th Cir. 2003)). Although federal law broadly

defines which of a debtor's property interests are included in the estate, state law typically fills in the details and defines the existence and scope of those property interests. Bracewell, 322 B.R. at 703, n.1 (citing In re Witko, 374 F.3d 1040, 1043 (11th Cir. 2004), Butner v. United States, 440 U.S. 48, 54 (1979)).

Here, the key issue is whether the $58,846.60 remaining on the Palm Bay Receivable was property of the estate on the date the debtor filed this case. The trustee asserts the receivable was just like any other asset of the estate—unencumbered and subject to administration by the trustee and to distribution to all general unsecured creditors on a pro-rata basis and not to one single unsecured creditor, MSM.

The Firm argues that the debtor had no interest in the Palm Bay Receivable on the petition date because of MSM's Writ of Garnishment. The Firm contends that Florida's garnishment laws operated to divest the debtor of its interest in the receivable and to impose a statutory lien in favor of MSM on the date the Writ of Garnishment was served upon the garnishee, Palm Bay.

Because MSM obtained its Writ of Garnishment in 1999, the Court must examine Florida's garnishment law in effect at that time. Florida Statute Section 77.06 established the effect of service of a writ of garnishment upon a garnishee and provided in relevant part as follows:

> 77.06. Writ; effect
>
> (1) Service of the writ shall make garnishee liable for all debts due by him or her to defendant and for any tangible or intangible personal property of defendant in the garnishee's possession or control at the time of the service of the writ or at any time between the service and the time of the garnishee's answer.
> Fla. Stat § 77.06 (1999).

In a decision binding upon this Court, the United States Court of Appeals for the Eleventh Circuit squarely addressed the question of whether service of a writ of garnishment

created a lien in favor of the garnishor in In re Masvidal, 10 F.3d 761, 763 (11th Cir. 1993).[5] The Court ruled unequivocally that the mere service of such a writ does not create a lien under Florida law.[6]

Under applicable law, therefore, service of a pre-judgment writ of garnishment serves to put the garnishee, here Palm Bay, on notice of a claim, here MSM's breach of contract claim against the debtor, but does not create any type of lien or security interest in the underlying debt, here the Palm Bay Receivable. MSM held no security interest, lien, or priority in the Palm Bay Receivable. On the date that the debtor filed this bankruptcy case, MSM was an unsecured creditor with a claim against the debtor. MSM's Writ of Garnishment did not give it a superior right to the Palm Bay Receivable vis-a-vis other unsecured creditors.

Nor did the debtor's factoring agreements with Cash Flow divest the debtor of its interest in the Palm Bay Receivable. After years of litigation, Judge Moxley correctly determined that Cash Flow held a perfected security interest in only a portion of the Palm Bay Receivable (Plaintiff's Ex. No. 4). Cash Flow held no right or security interest in the remaining $58,846.60, the amount at issue in this litigation.

Further, neither the debtor nor its principals made any representation before filing this case that would divest the debtor of its interest in the Palm Bay Receivable or estop the trustee from asserting the estate's interest to the monies. In the release given to Palm Bay, the parties admittedly released Palm Bay from any further liability but agreed that the three remaining parties—MSM, Cash Flow, and the debtor—had yet to resolve between them who had the

---

[5] Masvidal was issued in 1993, before the 1999 garnishment law applicable to this case was in effect. However, the garnishment law considered by the Eleventh Circuit Court was substantively the same as Florida's garnishment law in 1999. As such, the Masvidal decision controls in this case.

[6] The Florida legislature amended Florida Statute Section 77.06 in 2000, abrogating the ruling of the Eleventh Circuit in Masvidal. Pursuant to the amended Section 77.06, service of a writ of garnishment thereafter did create a lien in favor of the creditor/garnishor. In re Specialty Property Development, Inc., --- B.R. ----, 2008 WL 5510216, (Bankr.M.D.Fla.2008).

superior claim to the receivable. Although the Firm argues otherwise, *nothing* in the release indicates that the debtor waived any interest it had in the receivable as of the date the release was signed on November 5, 2004.

The debtor filed this case just a few weeks later on December 16, 2004, still claiming an interest in the receivable that it generated through its work for Palm Bay. Neither the debtor nor its principals ever disclosed the existence of the outstanding Palm Bay Receivable or the pending litigation with MSM in its bankruptcy pleadings.

Rather, months after the bankruptcy filing, on February 3, 2006, the debtor's former principals, Messrs. Newgent and Watson, signed a stipulation, through their attorney, at that belated date agreeing that MSM, an *un*secured creditor, could receive the remaining amount of the Palm Bay Receivable not paid to Cash Flow. Of course, by this point, with the interceding bankruptcy and the appointment of the trustee to administer the debtor's estate, the debtor's principals lacked any authority to make this representation. Debtors lose the authority to use, acquire or dispose of their property once a Chapter 7 bankruptcy petition is filed. In re Hodes, 235 B.R. 104, 108 (Bankr.D.Kan.1999). Rather, these powers vest in the Chapter 7 trustee, who "is placed in charge of the debtor's interests in property and is provided the tools for collecting, liquidating, and distributing those interests." In re Frausto, 259 B.R. 201, 211 (Bankr.N.D.Ala.2000) (referencing 11 U.S.C. § 704(1)). As such, this belated agreement by the debtor's principals was ineffective and a legal nullity. It certainly did not affect the trustee's right to claim the estate's interest in the Palm Bay Receivable.

Nor did the order granting Cash Flow's motion for relief from stay sanction the Firm and MSM's action in transferring the monies to MSM. The Order Granting Relief from Stay (Doc. No. 18 in the Main Case) specifically provided, "The relief from stay…in no way relieves any other creditor from the stay, including but not limited to MSM Golf, Inc." The order provides no help to MSM or to the Firm in getting them out of their predicament.

The Palm Bay Receivable properly was included in the property of this debtor's estate on the date this case was filed. The trustee should have had the opportunity to administer the asset to insure that all similarly situated unsecured creditors received equal, pro-rata distributions. Instead, with the Firm's assistance, MSM, a single unsecured creditor, improperly received the entire amount that was not subject to Cash Flow's security interest.

### The Firm and MSM Willfully and Knowingly Violated the Automatic Stay

The continuation of the litigation against the debtor and the distribution of the monies by the Firm to MSM violated the automatic stay. Pursuant to Section 362(a) of the Bankruptcy Code, the automatic stay instantaneously arises upon the filing of a bankruptcy petition and works to protect the debtor and the property of the debtor's estate from the claims of competing creditors racing to gain an advantage. The stay encompasses virtually every effort a creditor may take to collect a claim against a debtor in bankruptcy. All judicial proceedings commenced pre-petition against the debtor, such as that instituted by MSM, must cease. All attempts to collect on pre-petition claims and any act to obtain possession of or exercise control over property of the estate must stop. In sum, all efforts to exact payment on a debt from the debtor or the debtor's property must stop immediately when a bankruptcy petition is filed.

The automatic stay is effective against the world regardless of whether a party had notice of the bankruptcy filing or of the automatic stay. In re Peralta, 317 B.R. 381, 389 (B.A.P. 9th Cir. 2004). In the Eleventh Circuit, actions taken in violation of the automatic stay are void *ab initio* and therefore without effect. United States v. White, 466 F.3d 1241, 1244 (11th Cir.2006) (citing Borg-Warner Acceptance Corp. v. Hall, 685 F.2d 1306, 1308 (11th Cir.1982)). This includes orders entered by state courts. In re Clark, 373 B.R. 769 (Bankr. S.D. Fla. 2006) (citing In re Albany Partners, Ltd., 749 F.2d 670, 675 (11th Cir. 1984)).

Here, MSM and its attorneys knew of the debtor's bankruptcy filing almost immediately. Indeed, the Firm sent an attorney to monitor the debtor's meeting of creditors. They certainly knew the case was filed; a trustee was appointed to gather assets; and the automatic stay was in place.

The Firm and MSM knowingly and willfully violated the automatic stay in at least two ways. They continued the litigation against the debtor after this case was filed. More significantly, they disbursed funds of $58,846.60 that were property of this debtor's estate. In making this transfer, they obtained a Stipulation Regarding Disbursements to convince a state court judge, who had no knowledge of this bankruptcy, to sign an order directing the Firm to send the money to their client, MSM. In continuing the state court litigation, in obtaining the court order providing for the release of the $58,846.60 to MSM, and in actually transferring the monies to MSM, both MSM and the Firm violated the automatic stay. Neither MSM nor the Firm ever disclosed the existence of the Palm Bay Receivable to the Chapter 7 trustee, who had every legal right to administer the property, even though they knew of the pendency of this case and the appointment of the trustee.

In Count 1, the trustee seeks a declaratory judgment determining that MSM and the Firm willfully violated the automatic stay, are jointly and severally liable to the debtor's estate for $58,846.60, and that the state court order entered on March 6, 2006 (Plaintiff's Ex. No. 6) is void *ab initio*. As explained above, the Court easily finds that both MSM and the Firm willfully and knowingly violated the automatic stay by continuing the litigation against the debtor and by orchestrating the improper distribution to MSM of $58,846.60. They are jointly and severally liable for returning the funds to the trustee. Moreover, the state court order, entered by Judge Moxley on March 6, 2006, which authorized the transfer to MSM, is void *ab initio*, insofar as it was entered unknowingly by the state court in violation of the automatic stay.

The trustee next seeks sanctions against the Firm and MSM for the violation of the automatic stay. Pursuant to Section 105 of the Bankruptcy Code, it is widely recognized that courts can award sanctions, including damages, costs, and attorney fees, incurred as the result of willful violations of the automatic stay. In re Rush-Hampton Industries, Inc., 98 F.3d 614, 617 (11th Cir. 1996) (Bankruptcy court has statutory and inherent power to impose proper sanctions, including damages, costs, and attorney fees for violations of the automatic stay); In re Jove Engineering, Inc., 92 F.3d 1539 (1996) (Section 105(a) of the Bankruptcy Code allows a bankruptcy court to issue any order, process, or judgment that is necessary or appropriate to carry out provisions of the bankruptcy statutes, including assessing damages for violating the automatic stay); In re Dyer, 322 F.3d 1178 (9th Cir. 2003); In re Campbell, 398 B.R. 799, 815 (Bankr.D.Vt.2008); In re Schissler, 2007 WL 3254360 * 4 n. 8 (Bankr.N.D.N.Y. Nov.2, 2007); In re Lickman, 297 B.R. 162, 196 (Bankr.M.D.Fla.2003) (trustee could obtain award of damages for willful stay violations pursuant to Section 105(a)); In re Glenn, 379 B.R. 760 (Bankr. N.D. Ill. 2007). For example, the bankruptcy court in In re Joyner, 326 B.R. 334 (Bankr. D. S.C. 2004), awarded attorney's fees and costs to the Chapter 7 trustee and the debtor pursuant to Section 105(a) of the Bankruptcy Code based upon a creditor's violations of the automatic stay and also required the creditor to pay the value of collateral it wrongfully repossessed over to the trustee pursuant to Section 542(a).

In this case, the Firm and MSM collectively worked to collect property of the debtor's estate after this case was filed and correspondingly deprived the estate of the property by making the transfer to MSM. The transfer was jointly orchestrated by both MSM and the Firm and could not have occurred without the Firm's legal assistance. As such, pursuant to Section 105(a) of the Bankruptcy Code and based on the Firm's and MSM's blatant violation of the automatic stay, the Court finds that it is necessary and appropriate to require the Firm and MSM to reimburse the estate for the monies transferred to MSM. The Firm and MSM, therefore, are jointly and

severally liable for the return of the $58,846.60 they improperly transferred away from the debtor's estate. MSM and the Firm also appropriately should pay all of the costs and fees the trustee incurred in bringing this litigation, none of which would have been necessary if the parties had complied with the provisions of the automatic stay.

Accordingly, as to Count 1, the Court will enter a final judgment in favor of the plaintiff and against the defendants, MSM and the Firm, jointly and severally, initially in the amount of $58,846.60. The trustee shall file an affidavit as to all fees and costs she incurred in connection with this adversary proceeding within 21 days of the entry of this order. MSM and the Firm shall have 21 days thereafter to file an objection to the trustee's fees and costs. If an objection is timely filed, the Court will set a further hearing. If *no* objection is timely filed, the trustee is directed to submit a supplemental final judgment to award all fees and costs incurred by the trustee.

## Turnover of the Monies Paid to MSM Also is Required

Turning to Count 2 of the complaint, the trustee seeks turnover of the monies transferred to MSM because the $58,846.60 constituted property of this debtor's estate. Section 542 of the Bankruptcy Code requires, with certain exceptions, that any entity holding property of the estate deliver such property, or the value of such property, to the trustee. Section 542 establishes the "general rule that 'any property of a debtor's estate held by any entity must be turned over to the trustee. . .'" In re U.S.A. Diversified Products, Inc., 193 B.R. 868 (Bankr. N.D. Ind. 1995) (quoting In re NWFX, Inc., 864 F.2d 593, 596 (8th Cir. 1989)). A trustee seeking turnover pursuant to Section 542 carries the burden of proving that: 1) during the case; 2) an entity other than a custodian; 3) was in possession, custody or control; 4) of property that the trustee could use, sell or lease; and 5) such property is not of inconsequential value or benefit to the estate.

U.S.A. Diversified, 193 B.R. at 872.[7] "The obligation to turnover extends not just to property *presently* in someone's possession, custody or control but to property in its possession, custody or control *during the case.*" Id., at 874-75 (emphasis in original, internal quotations omitted).

Using the higher standard of proof, the trustee has demonstrated clearly and convincingly that during this case both MSM and the Firm, neither of who would qualify as custodians, held property subject to administration by the trustee, specifically $58,846.60, which certainly is not of inconsequential value or benefit to the estate. Because the monies were in the possession, custody, and control of both MSM and the Firm at some time during the case, the obligation to return the monies is a joint and several obligation.

As to the Firm, the only possible debatable element is whether the Firm was merely the "custodian" of the Palm Bay Receivable such that the Firm should not be compelled to turnover the monies to the trustee. In In re U.S.A. Diversified Products, Inc., 193 B.R. 868 (Bankr. N.D. Ind. 1995), the Bankruptcy Court for the Northern District of Indiana granted a trustee's turnover request against a law firm in similar circumstances finding that the law firm improperly disbursed monies to their client when the firm had notice and actual knowledge of the client's pending bankruptcy case and knew the monies were property of the bankruptcy estate. The court rejected the law firm's argument that it was a mere custodian. Rather, the court found that the "possession, custody, or control required by § 542 does not require an assertion of economic self

---

[7] Courts disagree on whether the trustee bears the burden of proof by a preponderance of the evidence or by clear and convincing evidence. Compare In re Santaella, 298 B.R. 793 (Bankr. S.D. Fla. 2002) (applying preponderance standard and finding that standard to be consistent with the growing weight of authority and listing cases) with In re U.S.A. Diversified Products, Inc., 193 B.R. 868 (Bankr. N.D. Ind. 1995) and Evans v. Robbins, 897 F.2d 966, 968 (8th Cir. 1990) (applying clear and convincing standard) and In re Lawrence, 251 B.R. 630, 639 n.7 (S.D. Fla. 2000) (noting that trustee did not contest use of clear and convincing standard at trial).

interest in the property" and the fact that the law firm "had the ability and obligation to deliver the funds [under applicable professionalism rules] clearly indicates that [the firm] had some degree of possession, custody, or control over the property." U.S.A. Diversified, 193 B.R. at 874. Just as the firm had the ability to deliver the funds to the debtor's principal, it also had the ability to deliver them to the Chapter 7 trustee or to at least seek guidance from the bankruptcy court. Id., at 874, n.5.

Here, the Firm certainly acted as more than a mere custodian blindly delivering property to its client. The Firm actively monitored the debtor's bankruptcy case, even sending a lawyer to the meeting of creditors. The Firm was lead counsel in continuing litigation against the debtor after the bankruptcy filing. The Firm obtained a court order purportedly authorizing a transfer of the monies to MSM without informing the state court of the interceding bankruptcy filing. Given the Firm's level of involvement, here, as in U.S.A. Diversified, the Court concludes that the Firm was not a mere custodian. The Firm clearly could have sought permission or guidance from this Court, but did not.

Accordingly, under Count 2, finding that the trustee has clearly and convincingly proven all five elements of turnover, the Court will enter a final judgment in favor of the trustee and against MSM and the Firm finding that they are jointly and severally obligated to turnover the sum of $58,846.60 to the trustee, upon which execution shall lie and interest will accrue.

DONE AND ORDERED in Orlando, Florida, on March 2, 2009.

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Plaintiff:  Marie E. Henkel, 3560 S. Magnolia Avenue, Orlando, FL 32806

Counsel for the Plaintiff:  Lynnea Concannon, LS Concannon PA, P.O. Box 915875, Longwood, FL  32791

Defendant:  Frese, Hansen, Anderson, Hueston, & Whitehead, PA, 930 S. Harbor City Blvd., Suite 505, Melbourne, FL  32901

Counsel for the Defendant:  David L. Wildman, David L. Wildman, PA, P.O. Box 1029, Melbourne, FL  32902

Defendant:  MSM Development Co., 620 Erie Blvd., Suite 312, Syracuse, NY  13204